IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 22, 2009 Session

## WILLIAM ARTHUR SHELTON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Bradley County**
**No. M-07-469    Carroll L. Ross, Judge**

---

**No. E2009-00582-CCA-R3-PC - Filed December 28, 2009**

---

The petitioner, William Arthur Shelton, appeals from the dismissal of his petition for post-conviction relief. In this appeal, he contends that he was denied the effective assistance of counsel at trial and on appeal. Discerning no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Kenneth L. Miller, Cleveland, Tennessee, for the appellant, William Arthur Shelton.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; Steve Bebb, District Attorney General; and Wayne Carter, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In October 2004, a Bradley County Criminal Court jury convicted the petitioner of three counts of false imprisonment, two counts of vandalism, and one count of premeditated first degree murder. On direct appeal, this court affirmed the convictions and the effective sentence of life imprisonment, *see State v. William Arthur Shelton*, No. E2005-02014-CCA-R3-CD (Tenn. Crim. App., Knoxville, Nov. 9, 2006), and our supreme court denied permission to appeal on March 12, 2007. The petitioner's convictions relate to his holding Charlene Hyatt, Brian Hyatt, Jr., and Shera Holt against their will at the home of Melissa Proctor on October 20, 2003. The proof at trial established that the petitioner believed that his wife was having an affair with Mrs. Hyatt's husband, Brian, and that the petitioner expressed his intention to "'hurt [Brian Hyatt] real bad'" or "'mess [him] up.'" *See id.*, slip op. at 2. While he held Mrs. Hyatt and her children at Ms. Proctor's home, the petitioner vandalized two vehicles belonging to Brian Hyatt and left a message with Mrs. Hyatt's mother that Brian Hyatt should pick his wife and children up at Ms. Proctor's residence. *See id.* The petitioner told Ms. Proctor's live-in boyfriend, Robert Holt, that he intended to kill Brian Hyatt. Mr.

Holt and a neighbor were able to calm the petitioner so that he left Ms. Proctor's residence at 11:00 or 11:30 p.m. *See id.*

At approximately 6:20 a.m. the following morning, the petitioner, his wife, and their two children returned to Ms. Proctor's home, where the petitioner awaited the arrival of Brian Hyatt, who the petitioner believed would ride to work with Mr. Holt. *See id.* As he waited, the petitioner again threatened to kill Brian Hyatt. When Brian Hyatt had not arrived by 8:30 a.m., the petitioner told Ms. Proctor, "'We are going up on the hill.'" *Id.* The petitioner then traveled to Brian Hyatt's residence, where he "beat on the kitchen door and windows." "Brian [Hyatt] got out of bed, picked up a pair of bolt cutters, and started out of the bedroom." *Id.* Brian Hyatt put the bolt cutters down at his wife's request and went unarmed to meet the petitioner. *See id.*

When Brian Hyatt asked the petitioner why he was there, the petitioner replied, "'You know what I'm doing here." *Id.*, slip op. at 3. The petitioner then "hit Brian [Hyatt] on the side of his head with a baseball bat then stabbed him in the chest." *Id.* Brian Hyatt later died as a result of his injuries.

The petitioner's wife testified that although she could not see whether Brian Hyatt was armed during the confrontation, the petitioner told her that Brian Hyatt had come at him with a knife. *See id.* The petitioner did not testify.

On November 16, 2007, the petitioner filed a timely petition for post-conviction relief alleging that he had been denied the effective assistance of counsel, primarily because his trial counsel "was laboring under a conflict of interest." An amended petition for post-conviction relief filed by post-conviction counsel specified that trial counsel "failed to present proof of [the petitioner's] previously diagnosed mental illness in an effort to negate the element of pre-meditation," that trial counsel "failed to present significant proof of [the petitioner's] intoxication through both drugs and alcohol at the time of the killings [sic] in an effort to negate the appropriate mental capacity to form premeditation," that trial counsel "failed to object to the [trial court's] charge that intoxication did not apply to First Degree Murder and failed to raise this issue on appeal," that trial counsel "failed to have [the petitioner] sign a written waiver of conflict as to his representation of the alleged victim," and that trial counsel "failed to properly prepare the record on [the petitioner's] appeal thereby waiving crucial issues."

At the November 6, 2008 evidentiary hearing, the petitioner's maternal aunt, Marlene Boles, testified that she raised the petitioner after his mother passed away when he was five years old. She recalled that the petitioner had difficulty processing his mother's death, which had occurred at the hands of his stepfather while he and his younger brother were present. She stated that her mother initially gained custody of the two boys, and she and her mother took the petitioner to a psychiatrist. According Ms. Boles, the psychiatrist explained that the petitioner's "mind, when he was eight-year-old, had froze; it was still what it was at five. He could not face the fact and say that his mother was deceased." Ms. Boles recalled that the petitioner claimed that his mother played with him. She stated that the petitioner had received some kind of mental health treatment consistently since 1978. She testified that she explained the petitioner's mental health history to trial counsel.

-2-

Ms. Boles testified that although trial counsel subpoenaed her to trial, she was never called as a witness. She recalled that as she sat outside the courtroom, she observed trial counsel speaking with members of Brian Hyatt's family on one occasion during the petitioner's second trial.[1] During cross-examination, Ms. Boles admitted that trial counsel spoke to the Hyatt family only after she told him that members of the family had threatened the petitioner's wife.

The petitioner testified that trial counsel told him that trial counsel "was representing Brian Hyatt on a burglary charge, but that wouldn't be any problem." The petitioner stated that he "had a problem with" trial counsel's having represented Brian Hyatt and with what he deemed trial counsel's friendly rapport with Mr. Hyatt's family. The petitioner recalled that after his first trial ended in a mistrial, he asked the trial court to appoint different counsel "because of . . . the way things [were] unfolding." He added, "So he denied it. When he did, I decided right then that I wasn't gonna testify until I got a post-conviction, because I felt that, . . . to be perfectly honest, I felt I was getting screwed." According to the petitioner, when he brought his concerns to the attention of the trial court, the court told him that "if [he] couldn't hire an attorney right then, that [he] was keeping the attorney that [the trial court] gave [him]."

The petitioner testified that he submitted to a mental health evaluation prior to trial. He stated that he never discussed his previous mental illness with trial counsel. The petitioner stated that he informed trial counsel that he had been drinking alcohol and smoking crack cocaine on the night of the kidnapping. Despite this information, trial counsel failed to call witnesses to support the petitioner's claim of voluntary intoxication. The petitioner admitted, however, that "[a]in't nobody knowed [sic] that but me and Audrey Conner, and we was in her house." The petitioner added that trial counsel failed to object when the trial judge instructed the jury that "[i]ntoxication does not apply to the first degree murder charge."

Additionally, the petitioner testified that his counsel failed to preserve an evidentiary issue for appeal regarding the admission of a pretrial statement given by his wife to police. He also claimed that counsel failed to object to the prosecutor's inflammatory closing argument and also failed to raise the issue on appeal. The petitioner claimed that the prosecutor told the jury, "[I]f I came to his house at seven o'clock in the morning, beating on his doors and windows, that a steak knife would be the least of my worries because I would be looking down the barrel of a .12 gauge shotgun, and he would separate me from my body with lethal force, and have no remorse doing so."

Trial counsel, District Public Defender for Bradley County, testified that he began representing the petitioner following his appointment to the case in general sessions court. Trial counsel stated that at the time of Brian Hyatt's death, Mr. Hyatt "was under indictment . . . in Bradley County for a . . . theft[] that involved his father-in-law" and that the public defender's office had been appointed to represent him. According to trial counsel, although he had previously represented Mr. Hyatt on a charge of felony vandalism, he "had not personally spoken to Mr. Hyatt" about the pending theft charge. Trial counsel recalled that "there was an outstanding capias for [Mr. Hyatt's] arrest at the time that he was killed." He testified that he informed the petitioner of his

_____

[1]Apparently, the petitioner's first trial ended in a mistrial.

previous representation of Mr. Hyatt and of his office's appointment to Mr. Hyatt's pending case. Trial counsel stated that although the petitioner appeared "very suspicious of the quality of his representation by the Public Defender," trial counsel did not believe that a conflict of interests existed because "[t]here was no connection at all" between the two cases. Trial counsel testified that even though he was aware of the information from the outset of their relationship, the petitioner raised no objection until the second day of trial. Counsel recalled that the petitioner filed a disciplinary complaint with the Board of Professional Responsibility regarding the alleged conflict and that the Board ruled "that no conflict existed at the time this case was tried."

Trial counsel testified that he met with Ms. Boles and that she informed him that the petitioner "had been treated for some mental health difficulties." He stated that as a result of this information, he asked for a mental health evaluation for the petitioner. Trial counsel recalled that the petitioner did not want to undergo the evaluation alone, so trial counsel attended the examination with the petitioner. Trial counsel stated that despite the petitioner's having been diagnosed with post-traumatic stress disorder, trial counsel "never had any concerns about his competency to stand trial." He explained, "I knew from sitting in on the evaluation that a defense of insanity could not be supported. I knew they could not support a defense of diminished capacity. I did not seek an independent expert." Trial counsel testified that he knew that the petitioner had been drinking on the night of the kidnapping but said that he did not recall the petitioner's telling him that he had "ingested anything further" before returning to Mr. Hyatt's residence the following morning. Trial counsel stated that he did not believe that neither the petitioner's mental health issues nor his voluntary intoxication rose to the level of a defense to Mr. Hyatt's homicide.

Trial counsel testified that he and the petitioner made the decision together to pursue a theory of self-defense and that the petitioner's decision, made during trial, not to testify "undermined that defense." Trial counsel stated that he told the petitioner that it was "very important" that he testify and that because the State had not filed notice of any convictions with which it intended to impeach the defendant, "[t]here was no reason for him not to testify." Trial counsel recalled that he found out on the second day of trial that the petitioner did not intend to testify. Trial counsel stated that the petitioner's decision forced the defense to rely on the testimony of the petitioner's wife. He testified that Ms. Shelton's testimony was weakened by her pretrial statement to police, which he characterized as "good and bad" and "contradictory in places."

Trial counsel testified that, with the petitioner's decision not to testify, the defense lost any testimony regarding the petitioner's level of intoxication at the time of Mr. Hyatt's murder. Counsel recalled that he questioned Ms. Conner, with whom the petitioner claimed to have been drinking and using cocaine, about the use of drugs and alcohol but that Ms. Conner denied using either.

Trial counsel admitted that he made a mistake by failing to ask that Ms. Shelton's entire statement be made an exhibit to her testimony. He explained that the prosecutor cross-examined Ms. Shelton with the most damaging portions of the statement and that the prosecutor made those portions of the statement an exhibit. Trial counsel stated that he did not similarly ask that the rest of the statement be made an exhibit to satisfy the rule of completeness. He insisted, however, that he had questioned Ms. Shelton about the substance of her statement. Nevertheless,

he admitted that because he had failed to exhibit the whole of the statement to Ms. Shelton's testimony, he failed to perfect any issue regarding the statement for review on appeal.

During cross-examination, trial counsel again admitted his mistake in failing to exhibit Ms. Shelton's entire statement to her testimony, but he stated that he could not say that "there was anything in the statement that wasn't made part of the record that . . . would have altered the outcome of the case." The bigger problem, in trial counsel's estimation, was the petitioner's refusal to testify and "corroborate part of the things that his wife testified to."

Trial counsel reiterated that although he was aware of the petitioner's previous mental health issues, he was not "overly concerned about mental illness." He stated that the petitioner gave a very detailed account of the offenses, leading counsel to believe that the petitioner suffered no problems with his memory. Trial counsel stated that the petitioner's excellent recall of the details belied any claim that he suffered from diminished capacity due to voluntary intoxication. Trial counsel testified that the murder of Mr. Hyatt followed the false imprisonment at Ms. Connor's residence by approximately nine hours. Trial counsel explained that although the petitioner told him that the petitioner had used drugs and alcohol on the night of the false imprisonment, after Ms. Connor's denial and the petitioner's refusal to take the stand, trial counsel had no way to get any further proof of the petitioner's alleged intoxication into the record.

Trial counsel admitted that although he did not believe there was a conflict of interests regarding his previous representation of Mr. Hyatt, "it would have been better for [the petitioner's] peace of mind if [trial counsel] would have brought that to the [c]ourt's attention." Trial counsel explained that he was surprised when the petitioner raised the issue on the second day of trial because he "thought we were sort of beyond that issue."

After observing that he wanted to read the trial transcript before rendering a decision, the post-conviction judge took the petition under advisement.[2] By written order detailing its findings of fact and conclusions of law, the court denied post-conviction relief. Regarding the petitioner's claim that trial counsel performed deficiently by failing to present evidence of the petitioner's previously diagnosed mental illness, the post-conviction court accredited trial counsel's testimony and concluded, "Since there was nothing in the mental records that could have supported any defense

---

[2]The record establishes that, based upon information provided to the parties by the court reporter, post-conviction counsel abandoned his attempt to make the trial transcript part of the post-conviction record. The court reporter apparently believed that the trial court transcripts did not have to be made a part of the record because "[t]he Court of Appeals has the original." Despite that this court, the Court of Criminal Appeals, does maintain the original copy of the trial transcript as a part of the record from the petitioner's direct appeal, the transcript should have been made a part of the post-conviction record if, in fact, the petitioner intended the post-conviction court to rely upon the transcript in rendering its decision. This is especially true in a case such as this, where the post-conviction judge did not preside over the petitioner's trial. Because post-conviction counsel endeavored to do just that and because the post-conviction court did, in fact, rely upon the transcript in formulating its decision, we would feel comfortable taking judicial notice of our own records should the need arise. *See Phillip Mullins v. State*, No. M2008-00332-CCA-R3-PC, slip op. at 8 n.1 (Tenn. Crim. App., Nashville, Dec. 19, 2008). As that portion of the transcript containing the trial court's instructions to the jury was, in fact, included in the record in the current appeal as an exhibit to the post-conviction hearing, resort to judicial notice is not necessary.

of insanity, and since the records indicate that he was able to appreciate the wrongfulness of his actions, trial counsel could not have been ineffective . . . by failing to present evidence of such matters at trial." As to the petitioner's claim that trial counsel should have presented more proof of the petitioner's intoxication at the time of the murder, the post-conviction court determined that "[t]rial counsel was not ineffective . . . by failing to present evidence of alcohol consumption when, in fact, all evidence showed that the defendant was not consuming alcohol or ingesting drugs at the time of the homicide." The post-conviction court also found that trial counsel had not performed deficiently by failing to object to or challenge on appeal the trial court's instruction that "[i]ntoxication does not apply to the first degree murder charge" because "there was no evidence to support the giving of a jury instruction on intoxication pertaining to the homicide charge." Finally, the post-conviction court concluded that "[w]hile having the petitioner sign a written waiver of conflict might have been a good idea in this case, failure to do so does not amount to ineffective assistance of counsel."

In this appeal, the petitioner reasserts his claims of ineffective assistance of counsel, alleging deficient performance by counsel's failure to present proof of the petitioner's previously diagnosed mental illness and his voluntary intoxication, his failure to object to the trial court's instruction regarding voluntary intoxication, his failure to have the petitioner sign a written waiver of the alleged conflict of interests, and his failure to properly preserve the issue of Ms. Shelton's statement for appeal. The State contends that the post-conviction court properly denied relief.

The post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first whether "the advice given, or the services rendered by the attorney, are within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S. Ct. at 2068. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697, 104 S. Ct. at 2069; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief

on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

### I. Proof of Petitioner's Mental Illness

The petitioner contends that trial counsel erred by failing to present proof of his previously diagnosed mental illness to negate the element of premeditation. The petitioner failed to present proof at the evidentiary hearing, however, to establish that he suffered from a mental illness that would, in fact, have negated the mens rea element of first degree murder. The petitioner's aunt testified that he suffered from post-traumatic stress disorder following the death of his mother when he was a young child and that he had periodically been under the care of a physician for mental illness. She did not testify, however, that the petitioner was under a doctor's care at the time of the murder of Mr. Hyatt. Further, trial counsel testified that he requested a mental health evaluation based on Ms. Boles's statements to him regarding the petitioner's mental health and that the evaluation confirmed his belief that the petitioner's capacity was not diminished by mental illness and that he was competent to stand trial. The petitioner presented no proof at the evidentiary hearing to support his claim that he was suffering from a mental disease or defect at the time of the offenses that would have diminished his capacity to form the necessary mens rea for the crimes. In consequence, he has failed to establish that trial counsel performed deficiently by failing to present proof of his mental illness at trial.

### II. Petitioner's Intoxication

The petitioner also claims that trial counsel was ineffective by failing to present proof of the petitioner's voluntary intoxication at the time of the murder in effort to negate the element of premeditation. Again, however, the petitioner failed to present evidence that he was, in fact, intoxicated at the time of the murder. The petitioner testified that he and Audrey Connor consumed alcohol and crack cocaine on the evening before the murder, but he admitted that this consumption preceded the murder by several hours. In his brief, the petitioner points to his own testimony at the evidentiary hearing as proof of his intoxication, but the petitioner had refused to testify at trial. Further, Ms. Connor, with whom the petitioner claimed to be using drugs and alcohol, denied using drugs with the petitioner. In consequence, there was no evidence of intoxication that trial counsel

could have presented. Trial counsel will not be held responsible for failing to present proof that simply did not exist at the time of trial.

### III. Trial Court's Instruction on Intoxication

The petitioner complains that trial counsel erred by failing to object to the trial court's instruction that its instruction on voluntary intoxication did not apply to the charge of first degree murder. As discussed above, however, there was simply no proof that the petitioner was intoxicated at the time he killed Mr. Hyatt, and there was no proof that the petitioner's earlier intoxication affected his mental capacity at the time of the murder. Accordingly, the trial court correctly concluded that an instruction on intoxication as to that offense was not warranted. *Harrell v. State*, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979) (holding that any instruction on voluntary intoxication is not warranted unless there is "evidence that the intoxication deprived the accused of the mental capacity to form specific intent" and observing that "[t]he determinative question" is what was the defendant's "mental capacity"). Because the trial court's instructions were a correct statement of the law as applied to the present case, trial counsel did not perform deficiently by failing to object to the instruction at trial or challenge it on appeal.

### IV. Conflict of Interests

In his final claim, the petitioner asserts that he was denied the effective assistance of counsel at trial because trial counsel, who had previously represented Mr. Hyatt in a criminal case, was operating under an actual conflict of interests. In addition, he claims that trial counsel's failure to procure a written waiver of the conflict entitles him to post-conviction relief.

Prejudice will be presumed in cases where the petitioner has established that his trial counsel "'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U.S. at 692, 104 S. Ct. at 2067 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350, 100 S. Ct. 1708 (1980)). As the Court explained,

> [I]t is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.

*Id.* (citation omitted). "[A]n actual conflict of interest includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and loyalties.'" *State v. White*, 114 S.W.3d 469, 476 (Tenn. 2003) (citing *State v. Culbreath*, 30 S.W.3d 309, 312-13 (Tenn. 2000) (quoting Tenn. R. Sup. Ct. 8, EC 5-1)). "The proper focus is solely upon whether counsel's conflict affected counsel's actions." *Netters v. State*, 957 S.W.2d 844, 848 (Tenn. Crim. App. 1997).

Again, the petitioner failed to adduce any proof at the evidentiary hearing to support his claim that trial counsel was burdened by an actual conflict of interests. Trial counsel's accredited testimony established that he had previously represented Mr. Hyatt in a criminal case some years before he was killed by the petitioner. Trial counsel also testified that his office had been appointed to represent Mr. Hyatt on a criminal charge that was pending at the time of Mr. Hyatt's death but that neither he nor any other attorney from his office had met with Mr. Hyatt regarding the pending charge. Trial counsel insisted that he did not believe there to be a conflict of interests and that he revealed his previous representation of Mr. Hyatt to the petitioner as soon as he was appointed to the petitioner's case. Nothing suggests that trial counsel's representation of the petitioner was colored by his previous representation of Mr. Hyatt. To the contrary, the record establishes that counsel zealously represented the petitioner. Because the petitioner has failed to establish that trial counsel was burdened by an actual conflict of interests that adversely affected his representation of the petitioner, he is not entitled to relief on this issue.

Similarly, we fail to see how trial counsel's failure to procure a written waiver of the perceived conflict adversely affected the outcome of the trial. Although it might have been preferable to obtain a written acknowledgment of trial counsel's previous representation of Mr. Hyatt, because the previous representation did not, in this instance, rise to the level of a conflict of interests, no written waiver of the conflict was necessary. As such, the failure to obtain a written waiver under these circumstances did not render counsel's assistance ineffective.

Because the petitioner has failed to establish his claims by clear and convincing evidence, we affirm the judgment of the post-conviction court.

_____
JAMES CURWOOD WITT, JR., JUDGE